UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KATHLEEN HARTER,

      Plaintiff,

           v.

FRANKLIN COUNTY BOARD OF
COMMISSIONERS,

      Defendant.

                  **Case No. 2:23-cv-2995**
                  **Judge Edmund A. Sargus, Jr.**
                  **Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Franklin County Board of Commissioners (ECF No. 21) and a Motion for Summary Judgment filed by Plaintiff Kathleen Harter (ECF No. 22). Ms. Harter also moved to partially strike witness affidavits filed by Defendant. (ECF No. 31, PageID 1521–26.) For the reasons stated in this Opinion and Order, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment (ECF No. 21), **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 22), and **DENIES** Plaintiff's Motion to Strike (ECF No. 31, PageID 1521–26).

## BACKGROUND

### I. Summary

Plaintiff Kathleen Harter worked full-time as a Finance Administrator at the Franklin County ("County") Department of Sanitary Engineering ("DSE"). During the COVID-19 pandemic, Ms. Harter worked from home, like many office workers. With the approval of the Director of DSE, she teleworked for nearly one year based on her medical conditions, until the County implemented a new policy that permitted telework up to just 40% of working hours. The

Parties agree that Ms. Harter is disabled. The Plaintiff sought to continue her 100% telework arrangement based on her disability and the recommendation of her doctor, but the County denied her request as noncompliant with the telework policy. Ms. Harter rejected the County's offer to move her to a part-time position, working mostly at the office, and she went on FMLA leave. She refused to return to work in-person, and the County terminated her employment. She now sues the Franklin County Board of Directors ("the Board") for failure to accommodate her disability.

The crux of this case is whether Ms. Harter could perform the essential functions of her full-time position while working 100% from home (with occasional in-office work as needed) and whether the job required at least 60% attendance in-person. Each party moved for summary judgment, producing competing evidence about Ms. Harter's performance while working from home. Neither side meets their burden to demonstrate that no genuine issues of material fact remain for trial.

The Court now reviews the relevant background in more depth.

## II.    Ms. Harter's First Year at DSE

The Board hired Ms. Harter to work in DSE as a Finance Administrator (later reclassified as "Fiscal Officer 2") starting on June 14, 2021. (Harter Dep., ECF No. 28, 12:18–13:9.) According to the Finance Administrator job description, the position's purpose is "to oversee the accounting activities to include reporting, cash management activities, accounts payable, subsidized daycare, payroll activities, audit facilitation, fiscal contract monitoring, and cost allocation program and to supervise assigned fiscal staff." (ECF No. 28-1, PageID 1193.) The job duties include direct supervision of staff, data collection and analysis of water and sewage usage, monitoring DSE's finances, and providing fiscal advice regarding project planning, among other duties. (*Id.*)

Ms. Harter initially worked in-person at DSE's office for about six months. (Renner Dep.,

2

ECF No. 22-2, 10:6–14; Harter Dep., 13:13–15; 56:1–3.) Her supervisor, Stephen Renner (Director of DSE) reviewed her work positively on three-month and six-month performance reviews. (Renner Dep., 16:12–19; ECF No. 22-2, PageID 354–63.)

In January 2022, Ms. Harter experienced a "flare-up" in pain, severe fatigue, and dizziness related to medical conditions, which include fibromyalgia, chronic fatigue syndrome, migraines, peptic ulcer disease, depression, and PTSD. (Harter Dep., 51:15–52:12.) She emailed Julie Hammond, a Franklin County Human Resources Officer, requesting information about the disability accommodation process. (ECF No. 21-4, PageID 165–66.) Ms. Hammond informed Ms. Harter that, per Board policy, she should request accommodations through Mr. Renner. (*Id.*)

Mr. Renner testified Ms. Harter told him in January 2022 that "she had a medical condition and she had a doctor's excuse to start working from home and it was supposed to be temporary." (Renner Dep., 10:17–11:15.) He approved Ms. Harter's request to temporarily work 100% remotely from her home. (*Id.*, 11:20–12:1.) Under this arrangement, Ms. Harter considered herself "an employee with a disability accommodation that involved teleworking." (Harter Dep., 44:4–12.) She regularly discussed with Mr. Renner the option to come into the office "as needed." (*Id.*, 68:16–23.)

About six months later, Mr. Renner completed Ms. Harter's annual performance review covering July 1, 2021, through June 30, 2022. (ECF No. 22-2, PageID 364–69.) He assessed her in five out of nine categories as "Exceeds Expectations" and in the other four categories as "Successfully Meets Expectations." (*Id.*, PageID 364–65.) In the review, Mr. Renner stated Ms. Harter "has been working 100% remotely, but continues to work with her manager and others, staying an active member of our team," and she "is readily available for any meeting, or even a simple phone/video call." (*Id.*, PageID 367.) The review does not include any negative remarks or

concerns regarding Ms. Harter's performance working from home. (*See id.*, PageID 364–69.)

### III.    Criticism of Ms. Harter's Job Performance

Later in time, DSE employees criticized Ms. Harter's remote job performance after she was terminated and filed this lawsuit, in contrast to Mr. Renner's contemporaneous reviews of her performance. When asked about his positive annual review of Mr. Harter's performance during a June 2024 deposition, Mr. Renner testified "I'm not going to put anything that's derogatory in a public record, especially for somebody that's—that's so new," and "what I do is I actually try to win over employees and try to get them to perform." (Renner Dep., 25:3–26:1.) Still, he testified that his statements in the review were truthful and accurate. (*Id.*, 26:6–11.)

Later, in an August 2024 affidavit (about one year after the Board terminated Ms. Harter's employment), Mr. Renner stated,

> After Harter began working from home pursuant to the temporary remote work arrangement, I observed a noticeable decrease in Harter's productivity and development. Specifically, I observed Harter was unable to consistently and effectively interact with other employees while working remotely, which caused missed deadlines, a lack of project oversight, and failed quality control. I also observed that Harter could not perform certain job duties remotely, including cash reporting, pay-ins, onboarding assignments, and responding to public inquiries.

(Renner Aff., ECF No. 21-3, ¶ 11.)

Andres Flaker, a DSE Account Supervisor, stated in an August 2024 affidavit that Ms. Harter was his direct supervisor and that he relied on Mr. Renner for supervisory guidance after Ms. Harter started working remotely because it was difficult to communicate with Ms. Harter. (Flaker Aff., ECF No. 21-8, ¶¶ 3–5.) He also stated Ms. Harter's lack of communication led to unspecified project delays, her absence from the office meant she could not assist with auditing of in-office cash, and Ms. Harter "was unwilling or unable to respond to . . . public inquiries while working remotely." (*Id.*, ¶¶ 7–10.)

4

Ms. Harter testified she did not initially have a supervisory relationship with Mr. Flaker. (Harter Dep., 33:23–34:14.) Instead, Mr. Flaker reported to Mr. Renner, though Ms. Harter and Mr. Renner discussed eventually moving Mr. Flaker to Ms. Harter's direct supervision after an indeterminate time. (*Id.*) Eventually, Ms. Harter periodically asked Mr. Flaker to start coming to her with questions, and she believed he started to do so. (*Id.*, 34:17–35:17.) She could not recall the specific timing or instances of how the relationship changed, and she described it as "evolving." (*Id.*)

Steven Pearson, a Fiscal Officer 1 at DSE, made similar critical statements about Ms. Harter's limited communications while teleworking in his affidavit, which he also signed in August 2024. (ECF No. 21-7.) Additionally, he stated, "[a]lthough I was typically responsible for the physical delivery of [checks from our office to the County's Treasurer's Office], Harter's remote work provided little to no oversight over our administration of the pay-ins, and Harter was further unable to deliver the pay-ins as a result of her remote work." (*Id.*, ¶ 8.)

Ms. Harter testified that she directly supervised Mr. Pearson, had instant messaging conversations with him "at least three maybe" times per day, and routinely exchanged emails with him "[m]aybe three" times per day. (Harter Dep., 38:5–8.) Ms. Harter testified that Mr. Pearson came to her with problems about projects he was working on "[m]ultiple times a day" over instant messaging and email, which did not change when she started teleworking. (*Id.*, 20:4–10.) She came into the office to perform in-person tasks once during her period of telework when Mr. Pearson was on vacation, and said "[t]here was no other task that I was asked to do that needed done in person that I declined to do." (*Id.*, 61:9–62:3.)

## IV. Franklin County's Telework Policy and Ms. Harter's Telework Request

In August 2022, Franklin County implemented a new Telework Policy, effective

September 6, 2022, which states, "Generally, an employee should be teleworking for no more than 40% of their assigned schedule." (Telework Policy, ECF No. 21-4, PageID 169–75; ECF No. 22-2, PageID 370.) The policy also stated, "Individual telework agreements should be completed before teleworking commences whenever practicable." (Telework Policy, PageID 169.)

Ms. Harter informed Mr. Renner that she wished to continue her 100% remote teleworking arrangement and asked him how the Policy would affect her. (Harter Dep., 44:4–15; Renner Dep., 27:8–18.) Separately, on August 19, 2022, Ms. Harter emailed Ms. Hammond that she had "needs that require an ADA accommodation." (ECF No. 22-2, PageID 371.) On August 25, Ms. Hammond instructed Ms. Harter to submit an accommodation request to Mr. Renner and provided her an Americans with Disability Act ("ADA") Questionnaire to complete with her medical provider. (*Id.*)

On October 24, 2022, Ms. Harter emailed Mr. Renner with documentation from her doctor regarding her request to continue working from home full-time indefinitely. (ECF No. 22-2, PageID 373.) She stated that her doctor recommended that she continue working from home for four months, at which point she would be reevaluated. (*Id.*) Mr. Renner approved the request "conditionally" because, he testified, "we're trying to figure out a process and procedure. I was trying to understand. I never at once believed that—that I was approving in full an accommodation but that she was going to be working from home again and it was temporary, and I'd extend it by another four months." (Renner Dep., 31:2–9.) He asked the County's Department of Human Resources ("DHR") for guidance because he "wanted to honor" Ms. Harter's request that she not disclose specifics about her medical conditions to him. (*Id.* 30:22–36:24.) Ms. Harter believed she was not required to complete an individual telework agreement because Mr. Renner had approved her request to continue working from home. (Harter Dep., 155:21–156:4.)

6

On December 1, 2022, at Mr. Renner's instruction, Ms. Harter applied for an individual telework agreement requesting 100% full-time work from home. (ECF No. 22-2, PageID 376.) Mr. Renner reviewed the form and added in a comments section, "I approve of 100% telework request per the doctor letter that was provided to me. Also, Ms. Harter has demonstrated that work can be accomplished and well; therefore no detriment to our department." (*Id.*; Renner Dep., 37:4–22.) Also on December 1, DHR received Ms. Harter's completed ADA Questionnaire and a letter from Ms. Harter's doctor. (ECF No. 22-3, PageID 513.)

On December 5, 2022, Ms. Hammond emailed Mr. Renner and informed him that Ms. Harter's application for an individual telework agreement was denied because it did not comply with the Telework Policy's 40% limit for telework. (ECF No. 22-2, PageID 380.) She stated that "if as was referenced in the documentation [Ms. Harter] provided, Ms. Harter is submitting a request to telework 100% as an accommodation recommendation from her health care provider, please begin the interactive process." (*Id.*)

**V. Accommodation Request to DHR**

On December 21, 2022, Ms. Harter submitted a request to DHR "for a reasonable accommodation to work from home 100% of [her] schedule." (ECF No. 28-1, PageID 1201.) Ms. Hammond emailed Mr. Renner about Ms. Harter's accommodation request and the ADA Questionnaire she submitted. (ECF No. 22-3, PageID 485.) Ms. Hammond stated she "would like to work in tandem with [Mr. Renner] to review her request." (*Id.*)

Ms. Harter's ADA Questionnaire was completed by her doctor and signed on October 8, 2022. (ECF No. 28-1, PageID 1197–99.) It states Ms. Harter is currently impaired with fibromyalgia, post-COVID syndrome, and migraine headaches and is "unable to sustain" working in an office setting more than three hours "due to fatigue." (*Id.*) Her impairments are described as

"temporary," with effects expected to last "6–8 months." (*Id.*) The recommendation is to "allow to continue to work from home." (*Id.*)

On January 6, 2023, Ms. Hammond informed Ms. Harter that "[Board] agencies are a public-facing entity and as such, it has been determined your position must have at least 60% in-person attendance. Your agency is unable to accommodate your request for 100% telework[.]" (ECF No. 22-3, PageID 488.) She offered Ms. Harter a reduced, 25-hour per week work schedule with three hours per day working in person and two hours per day working at home. (*Id.*) Ms. Hammond requested a response by January 12, 2023, and any additional information from Mr. Harter's health care provider regarding alternative accommodation suggestions by January 20, 2023. (*Id.*)

On January 12, 2023, Ms. Harter asked if the Telework Policy superseded her prior approval from Mr. Renner for 100% telework. (*Id.*, PageID 487.) On January 17, 2023 (around the time the COVID-19 pandemic was waning) Ms. Hammond stated,

> The scenario in which you were permitted to work a 100% telework schedule was during a "state of emergency" when business of the [Board] agencies were not being conducted in person. The state of emergency has ended. Business is once again being conducted in-person and we are all now required to return to work accordingly. Your request to telework is not a reasonable accommodation we can provide but we would welcome the opportunity to understand what other options may exist.

(*Id.*)

On February 14, 2023, DHR sent Ms. Harter a letter stating that it has "not received further communication from you or your health care provider" following up on the deadlines in Ms. Hammond's January 6, 2023 email. (ECF No. 22-3, PageID 491.) The letter stated the review was therefore "complete" and that DHR was "willing, at any point, to engage further in the interactive process with you" regarding potential alternative accommodations. (*Id.*) Last, the letter instructed

Ms. Harter to report to work in-office full-time starting with her next regular shift, explained the process for requesting FMLA leave and sick leave, and informed Ms. Harter that she could appeal the decision to the Director of DHR. (*Id.*)

Ms. Harter responded on February 16 and stated reducing her hours to part-time was not viable and she was unable to return to the office at that time. (ECF No. 22-3, PageID 494.) She asked, "it is apparent that no additional amount of documentation or recommendations from my health care provider(s) will result in greater than 40% telework to be approved, even temporarily. Is that correct?" (*Id.*) She did not request an alternative accommodation. (*See* Harter Dep., 142:22–143:4; 149:10–150:18; 152:24–153:6.)

The next day, Ms. Hammond told Ms. Harter the Board offered her an "alternative effective accommodation" and requested additional recommendations from her health care provider. (ECF No. 22-3, PageID 501–02.) She offered to continue the process "any time you would like" and asked Ms. Harter to:

> ask your health care provider for a response to the following:
>
> . . . [I]t has been determined Ms. Harter's position must have at least 60% in-person attendance. A request for 100% telework is not a reasonable accommodation we can provide . . . . Other than your suggestion for 100% telework, can you offer any other recommended accommodations we could consider to assist Ms. Harter in meeting her essential job duties with in-person attendance?

(*Id.*, PageID 502.) Ms. Harter responded on February 24, 2023, stating she was "unable to sustain at least 60% in office work currently due to my disabilities. This remains unchanged and no additional recommendation from my doctor outside of telework affect my inability to do so [at] this time." (ECF No. 22-3, PageID 501.) She asked if she was no longer permitted to work remotely. (*Id.*)

On February 28, 2023, Ms. Hammond provided FMLA leave information to Ms. Harter

and informed her "you are not approved to work from home." (ECF No. 28-1, PageID 1205.) She explained that "full-time, in-office attendance" was required and that Ms. Harter could request a telework arrangement in compliance with the Board's Telework Policy not to exceed 40% telework. (*Id.*)

## VI.    FMLA Leave, Termination, and This Lawsuit

Ms. Harter met with her doctor in February 2023 and provided the FMLA paperwork to DHR stating she would be incapacitated and unable to work from March 1, 2023, until May 1, 2023. (ECF No. 28-1, PageID 1181–82; Hammond Dep., ECF No. 22-3, 100:14–101:7; ECF No. 21-4, ¶ 14.) DHR approved her FMLA leave until May 1, 2023. (ECF No. 28-1, PageID 1183– 89.) Ms. Harter received an extension of her FMLA leave through May 23, 2023. (ECF No. 28-1, PageID 1209.)

Ms. Harter did not return to work after her FMLA leave ended on May 23, 2023. (ECF No. 28-1, PageID 1203.) Mr. Renner provided Ms. Harter notice of a July 7, 2023 pre-removal hearing and a copy of a discipline report. (*Id.*) At the hearing, Ms. Harter testified that she could not perform her job without full-time remote work. (*Id.*) Following the hearing, on August 11, 2023, the Board terminated Ms. Harter's employment, citing her failure to return to work and her non-compliance with the Board's attendance policies. (*Id.*, PageID 1203–04.)

Ms. Harter sued the Franklin County Board of Commissioners for disability discrimination, failure to accommodate, and retaliation, all under both the ADA and Ohio law, for a total of six claims. (ECF No. 8, ¶¶ 24–76.) She moved for summary judgment on the discrimination and failure to accommodate claims. (ECF No. 22.) The Board responded in opposition. (ECF No. 30.) Ms. Harter replied and stated her disability discrimination claims were "merged" with her failure to accommodate claims. (ECF No. 32, PageID 1544.)

The Board moved for summary judgment on all six claims. (ECF No. 21.) Ms. Harter responded in opposition as to the discrimination and failure to accommodate claims but stated she does not oppose the Board's Motion for summary judgment on her retaliation claims. (ECF No. 31.) She also moved to strike portions of Mr. Renner's and Ms. Hammond's affidavits. (*Id.*, PageID 1521–26.) The Board replied. (ECF No. 33.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In this case, both parties moved for summary judgment. Each party, as a movant, bears the burden of meeting the summary judgment standard. *Ray v. McCloud*, 507 F. Supp. 3d 925, 930 (S.D. Ohio 2020) (Watson, J.). The failure of one party to carry its burden does not mean that the other party should prevail on its motion; rather, the Court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

## ANALYSIS

The Court first determines whether Ms. Harter's retaliation and discrimination claims are abandoned or duplicative. The Court then turns to Ms. Harter's motion to partially strike affidavits filed by the Board. After resolving that motion, the Court addresses Ms. Harter's failure to accommodate claims.

### I. Disability Retaliation and Discrimination Claims

Because Ms. Harter has abandoned her retaliation claims (ECF No. 31, PageID 1535), the Court **GRANTS in part** the Board's Motion for Summary Judgment as to Ms. Harter's retaliation claims under the ADA and Ohio law, and they are **DISMISSED**.

Ms. Harter stated that her discrimination and failure to accommodate claims "are merged because 'an employer's failure to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of discrimination.'" (ECF No. 32, PageID 1544 (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)).) Although an employer's failure to reasonably accommodate an employee's disability is one way to demonstrate disability discrimination, a claim for disability discrimination casts a much wider net, and Ms. Harter's Amended Complaint advances both types of claims.

A disability discrimination claim and a failure to accommodate claim can involve the

application of different legal standards depending on the type of evidence used in support. A disability discrimination claim can be based on direct or indirect evidence. When the claim is based on indirect evidence, the *McDonnell Douglas* burden-shifting framework applies. *See A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But a failure to accommodate claim requires direct evidence of discrimination and thus is assessed under a separate legal standard.

In her Motion for Summary Judgment, Ms. Harter argues she is entitled to summary judgment on her failure to accommodate claim. (ECF No. 22, PageID 297.) In response to the Board's Motion for Summary Judgment on Ms. Harter's disability discrimination claims and her failure to accommodate claims, Ms. Harter defends all of those claims only on the ground that the Board failed to reasonably accommodate her disability. (ECF No. 31.)

Accordingly, to the extent Ms. Harter attempted to raise disability discrimination claims distinct from her failure to accommodate claims, the general disability discrimination claims are abandoned. To the extent she claims disability discrimination because of the Board's failure to accommodate, those claims are fully captured in her failure to accommodate claims under the ADA and Ohio law. Therefore, the Court **GRANTS in part** the Board's Motion for Summary Judgment as to Ms. Harter's general disability discrimination claims under the ADA and Ohio law, and they are **DISMISSED** as duplicative.

The Court proceeds with Ms. Harter's failure to accommodate claims after considering her Motion to Strike.

## II.    Ms. Harter's Motion to Strike

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The

13

determination of whether to strike a filing rests within the sound discretion of the Court. *See Wausau Benefits v. Progressive Ins. Co.*, 270 F. Supp. 2d 980, 985 (S.D. Ohio 2003) (King, M.J.). Motions to strike are generally disfavored and considered remedies that "should be sparingly used by the courts." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).

Ms. Harter moves to strike portions of Mr. Renner's affidavit (ECF No. 21-3) and portions of Ms. Hammond's affidavit (ECF No. 21-4). (ECF No. 31, PageID 1521–26.) She argues the statements contradict earlier testimony and are conclusory and unsupported by other evidence in the record. (ECF No. 31, PageID 1521.)

"At summary judgment, to evaluate a post-deposition affidavit's admissibility, [courts] ask first whether the affidavit 'directly contradicts the nonmoving party's prior sworn testimony." *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). "If so, absent a persuasive justification for the contradiction, the court should not consider the affidavit." *Id.* "But if no direct contradiction exists, 'the district court should not strike or disregard th[e] affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Aeral*, 448 F.3d at 908.

In his affidavit, Mr. Renner stated Ms. Harter approached him about working remotely because of concerns about the COVID-19 pandemic. (Renner Aff., ¶¶ 8–9.) This statement does not directly contradict Mr. Renner's earlier testimony that Ms. Renner sought to work from home because of her medical conditions.

Mr. Renner also stated that Ms. Harter's productivity and development declined when she started remotely and that her remote work caused missed deadlines and gaps in oversight. (Renner

Aff., ¶ 11–13.) As noted earlier, these affidavit statements are in tension with Mr. Renner's positive annual review of Ms. Harter's remote work performance, and, as assessed further below, the record lacks other contemporaneous evidence of Ms. Harter's performance deficiencies. But the statements do not directly contradict Mr. Renner's earlier deposition testimony explaining that, in his view, positive performance reviews were a means to inspire worker productivity and that he would not put derogatory comments in a public performance review. The Court (and the jury) can appropriately weigh the affidavit against the other evidence in the record, including Mr. Renner's prior statements.

In her affidavit, Ms. Hammond stated that she considered feedback from DSE before denying Ms. Harter's accommodation request. (Hammond Aff., ¶ 11.) This does not contradict her earlier testimony that she communicated with Mr. Renner about Ms. Harter's ability to work remotely and with the Director of DHR about Ms. Harter's remote work performance. (Hammond Dep., 38:9–18; 39:2–24.)

Last, Ms. Hammond stated she was not aware of any County employee giving Ms. Harter an ultimatum to return to the office or take FMLA leave. (Hammond Aff., ¶ 13.) Ms. Harter claims the record contradicts this statement, but the record supports that DHR proposed a partial telework schedule, provided Ms. Harter the option to appeal the decision, and offered to continue the interactive process with more input from Ms. Harter's medical providers.

For these reasons, the Court declines to strike the contested portions of Mr. Renner's and Ms. Hammond's affidavits. Ms. Harter's motion to strike is **DENIED**.

## III.     Failure to Accommodate

Ms. Harter claims that the Board failed to reasonably accommodate her disability, in violation of both the ADA and Ohio Revised Code § 4112.02. Federal courts generally apply an

ADA analysis to both claims. *See Jakubowski v. Christ Hospital, Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) ("Ohio's disability discrimination law parallels the ADA in all relevant respects."). The Court thus considers both claims under the ADA framework.

### A. Legal Framework

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Because reasonable accommodation claims "necessarily involve direct evidence (the failure to accommodate) of discrimination," the Court "jettison[s] the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).

Instead, to establish a prima facie failure to accommodate claim, the plaintiff "must show that (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) [the defendant] knew or had reason to know about her disability; (4) she requested an accommodation; and (5) [the defendant] failed to provide the necessary accommodation." *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). Under this framework, "once an ADA plaintiff establishes that an employer failed to accommodate a known disability, the employer bears the burden 'of proving that . . . a proposed accommodation will impose an undue hardship upon the employer.'" *Id.* (quoting *Kleiber*, 485 F. 3d at 868–69).

The Board concedes that Ms. Harter is disabled under the ADA (ECF No. 21, PageID 130), and Ms. Harter has provided evidence that she is disabled (*see* ECF No. 28-1, PageID 1197–99).

The Board argues it did not violate the ADA because Ms. Harter is not "otherwise qualified" to perform her job 100% remotely, working remote full-time is not a reasonable accommodation, the Board engaged in a good faith interactive process and offered a reasonable accommodation, and Ms. Harter abandoned the interactive process. (ECF No. 21, PageID 130–35.) Ms. Harter argues she was qualified to perform her duties working 100% remotely at home, working 60% of the time in the office is not an essential function of her job, and the Board's accommodation offer to reduce Ms. Harter schedule to part-time and require 60% of her work to be at the office was not reasonable. (ECF No. 22, PageID 300–07.)

The Board's argument that Ms. Harter's proposed accommodation of 100% telework was unreasonable is intertwined with its arguments that in-person attendance and specific in-person tasks were essential functions of her job. *See Rorrer*, 743 F.3d at 1039 ("A suggested accommodation is not reasonable if it requires eliminating an 'essential' function of the job." (citing 29 C.F.R. § 1630.2(o) (defining "reasonable accommodation"))). Accordingly, the Court first addresses the essential functions and reasonable accommodation arguments together as part of the "otherwise qualified" element of Ms. Harter's prima facie case. After concluding that genuine issues of material fact remain on the "otherwise qualified element," the Court addresses the Board's proposed alternative accommodation and whether either side abandoned the interactive process.

### B. Otherwise Qualified

To meet her prima facie burden to show she is otherwise qualified for the Finance Administrator position, Ms. Harter "must show that she can perform the essential functions of a job with or without an accommodation." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018). "A job function is essential if its removal would fundamentally alter the position."

17

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)). "Put another way, essential functions are the core job duties, not the marginal ones." *Hostettler*, 895 F.3d at 854 (citing 29 C.F.R. § 1630.2(n)(1)).

The parties dispute (1) whether in-person attendance at the DSE office is an essential function of Ms. Harter's job and (2) whether specific in-person tasks were essential functions of her position. The Sixth Circuit Court of Appeals has stated that "'[r]egular, in-person attendance is an essential function' of most jobs." *Id.* (citing *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015) (en banc)). But "it is not unconditionally so; courts must perform a fact-intensive analysis" to determine what functions are essential, including consideration of the time spent on a particular function, the employer's judgment, written job descriptions prepared before interviewing, and "the consequences of not requiring the employee to perform the particular function." *Id.* (citing 29 C.F.R. § 1630.2(n)(3)). The employer's judgment "receives some weight," but "is not the end-all—*especially* when an employee puts forth competing evidence." *Id.* at 854–55 (emphasis in original) (citing *Williams v. AT&T Mobility Servs.*, 847 F.3d 384, 391–92 (6th Cir. 2017)).

### i. In-Person Attendance

Ms. Harter's requested accommodation—100% telework from home—is directly at-odds with the Board's policy that all County employees must work at least 60% in-person at their agency's office. Even if Ms. Harter worked three hours per day in-person (which her doctor concluded was her daily limit) and the rest of her full-time schedule at home, she would only work 37.5% of her hours (15 out of 40 hours per week) in the office, far below the 60% minimum. The Board refused to make an exception to its Telework Policy to accommodate Ms. Harter's

18

disability, and it insists Ms. Harter's physical presence at the office for at least 60% of her working hours was an essential function of her job. But Ms. Harter's competing evidence shows a genuine issue of material fact.

Because Mr. Renner permitted Ms. Harter to work from home for more than a year before she took FMLA leave, her performance during that period provides evidence of the reasonableness of her requested accommodation. Mr. Renner assessed Ms. Harter's job performance after her first six months working 100% from home as exceeding or successfully meeting expectations in all nine assessment categories. In fact, he specifically remarked that she remained "an active member of our team," successfully worked with Mr. Renner and others, and was "readily available for *any meeting*, or even a simple phone/video call" even while "working 100% remotely." (ECF No. 22-2, PageID 367.)

In one instance, Mr. Renner emailed Ms. Harter in August 2022 about an issue with the physical delivery of pay-ins, a task typically assigned to Mr. Pearson. (ECF No. 28-1, PageID 1161.) Mr. Renner stated "I understand that you are remote and therefore cannot perform the pay-ins that are necessary. However, I do expect you to have a backup plan in times like this," referring to Mr. Pearson's temporary absence from work. (*Id.*) But Ms. Harter testified that she discussed the situation with Mr. Renner, and she came into the office and physically delivered the pay-ins in Mr. Pearson's absence. (Harter Dep., 64:17–66:4.) This example also supports Ms. Harter's testimony that she was available for certain in-person tasks "as needed" and discussed her availability with Mr. Renner. (*Id.*, 67:19–68:23.) Furthermore, Mr. Renner later told Ms. Hammond in December 2022, "[t]here is no risk to our departmental operations" from allowing Ms. Harter to continue working 100% remotely "as she has successfully demonstrated in full that she can perform her role via teleworking arrangements. And this is temporary." (ECF No. 22-3,

PageID 479.)

Otherwise, the Board's evidence that Ms. Harter's position required in-person work, including statements critical of Ms. Harter's performance in post-hoc affidavits by Mr. Renner, Mr. Flaker, and Mr. Pearson, all emerged after Ms. Harter was fired and after this litigation started. The Board identifies no other instances where DSE employees raised issues during Ms. Harter's employment with DSE about Ms. Harter's inability to perform specific tasks or similar concerns about Ms. Harter's absence from the office. The Board's witnesses' post-hoc statements about Ms. Harter's availability for communications and inability to perform certain tasks thus depends on those witnesses' credibility, which is not an appropriate determination for the Court on a motion for summary judgment. *See Rorrer*, 743 F.3d at 1038 ("Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." (quoting *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir.1999)).

Additionally, the Finance Administrator job description does not specify the need for in-person attendance. The Board argues the description requires employees to "maintain regular and predictable attendance," but the description does not distinguish between remote and in-person attendance at work. (ECF No. 21, PageID 131.) Regardless, "[a]n employer must tie time-and-presence requirements to some other job requirement" to show they are essential. *Hostettler*, 895 F.3d at 856. Ms. Hammond testified she determined in-person work was essential based on the job description's duties of monitoring "the agency's activities regarding accounts payable, payroll, budgets, and utility billing." (Hammond Dep., 43:3–44:2.) But she admitted she did not know how those tasks were performed, and she did not examine Ms. Harter's performance reviews before determining she could not perform her job remotely. (*Id.*, 37:4–6; 44:3–22.) As is further discussed in the next section, issues of fact remain regarding whether specific tasks required Ms. Harter's

20

frequent presence in the office.

Even so, Ms. Harter's supervisor and subordinates stated that her remote work arrangement hampered her performance as a supervisor and caused other employees to take over (or continue to perform) duties that Ms. Harter could only have performed in-person. This competing evidence raises genuine issues of material fact about whether in-person attendance was an essential function of the role with regard to her supervisory responsibilities. A jury is best suited to weigh the DSE employees' statements along with Mr. Renner's statements about his positive reviews of Ms. Harter's performance while working from home. (*See* Renner Dep., 25:24–26:11.) Whether the DSE employees' post-hoc statements are credible in light of Ms. Harter's performance review and the absence of contemporaneous evidence of problems with her remote work performance is a matter for the factfinder to resolve.

### ii.   Specific, In-Person Tasks

The parties also dispute whether specific, in-person tasks that were assigned to Ms. Harter or were otherwise part of her job description were essential functions of her position. The Board contends that in-person attendance was a "prerequisite to the job's other essential functions," including establishing a friendly atmosphere, providing fiscal advice, completing special projects, and responding to inquiries from the public. (ECF No. 30, PageID 1508.)

Ms. Harter testified that she had a regular, open line of communication with Mr. Renner and offered to come into the office "when it was needed, when there was something that I couldn't do from home." (Harter Dep., 67:19–23; 68:16–23.) For example, she came into the office once to drop off pay-ins when Mr. Pearson was on vacation. (Harter Dep., 157:16–22.) The Board argues Ms. Harter could not remotely perform duties such as cash reporting, making pay-ins, managing onboarding assignments, and responding to public inquiries. (ECF No. 30, PageID 1509.) But it

fails to demonstrate that there are no genuine issues of material fact that those specific tasks are essential functions of Ms. Harter's job.

Rather, there is evidence to support a claim that these specific tasks, to the extent Ms. Harter was even directly responsible for them, were "marginal" as opposed to "fundamental," and therefore that they were not essential. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (quoting 29 C.F.R. § 1630.2(n)(1)). The stated purpose of Ms. Harter's job, in part, is to "oversee the accounting activities to include reporting, cash management activities, accounts payable," and similar tasks. (ECF No. 21-9, PageID 280.) To the extent the delivery of pay-ins, cash reporting, and similar activities fell under that oversight umbrella, the Board has not shown that Ms. Harter had to perform tasks in-person to fulfill those oversight duties. For instance, Ms. Harter testified that pay-ins generally could be processed remotely except for physical delivery to the treasury, which was a task typically performed by Mr. Pearson with Ms. Harter's oversight. (Harter Dep., 90:3–92:5.) The record supports that Ms. Harter coordinated remotely with the rest of the team to ensure accounting, auditing, and cash management activities were completed. Absent from the record is persuasive evidence that Mr. Renner sought to correct any significant deficiencies in Ms. Harter's remote job performance.

There is a genuine issue of material fact as to whether in-person attendance was essential to fulfill Ms. Harter's role in responding to public inquiries. Ms. Harter testified that at DSE, inquiries and complaints from the public were first fielded by a staff of employees who reported to Mr. Flaker. (Harter Dep., 31:9–32:3.) Mr. Flaker escalated issues as needed, and Ms. Harter was involved in coordinating responses to relevant issues. (*See id.*, 32:4–20.) The Board does not explain how in-person attendance was necessary for Ms. Harter's role in responding to public inquiries—it does not argue that she would be fielding calls herself in-person (nor would that make

sense, given the other staff members already assigned to that task) or that she could not help resolve issues through email, instant messaging, or phone calls with DSE staff.

As discussed above, there is competing evidence in the record about Ms. Harter's ability to directly supervise her assigned staff, which is an essential function of her position, while working 100% from home. According to Ms. Harter's job description, she was responsible for assigning, reviewing, planning, and coordinating the work of other employees and recommending and approving transfer, promotion, and salary increase of other employees. (ECF No. 21-9, PageID 280.) Together with her job's emphasis on oversight, management, and coordination, the record shows that supervision of employees was a fundamental and essential part of Ms. Harter's job.

Although Mr. Renner did not identify shortcomings in those supervisory tasks in Ms. Harter's July 2022 performance review, Mr. Renner, Mr. Flaker, and Mr. Pearson all testified or stated that Ms. Harter's performance as a supervisor suffered when she worked remotely. Ms. Harter testified that she maintained daily communication with Mr. Pearson over instant messaging and email regarding his assigned tasks. But Mr. Renner stated in an affidavit that he "took over most day-to-day supervisory duties of Pearson and Flaker, as well as the accounting activities that Harter could not perform remotely." (Renner Aff., ¶ 13.) That competing evidence requires credibility determinations from a factfinder and raises a genuine issue of material fact regarding whether Ms. Harter could perform the essential function of supervision and management while working 100% from home.

In sum, genuine issues of material fact remain regarding whether in-person work was an essential function of Ms. Harter's position and whether she could perform the essential functions of supervision and management while working 100% from home. Answering those questions will also help the factfinder resolve the overlapping question of whether Ms. Harter's request for a

100% telework accommodation was reasonable. Thus, neither side has met their burden at summary judgment regarding whether Ms. Harter was otherwise qualified for her job with or without a 100% telework accommodation.

### C. The Board's Proposed Alternative Accommodation

Under the ADA, an "employer need not provide the accommodation that the employee requests or prefers" and may instead choose another effective, reasonable accommodation. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 459 (6th Cir. 2002). In other words, "an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided." *Id.* at 460. Accordingly, to survive the Board's motion for summary judgment, Ms. Harter "must demonstrate a genuine issue of material fact with regard not only to her entitlement to her requested accommodation, but also to the inadequacy of the offered alternatives." *Id.* (citing *Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997)).

After rejecting Ms. Harter's request for 100% telework, the Board offered to move her from a full-time position to a part-time (25 hours per week) schedule, with three hours of work in the office and two hours of work at home per day. Although that arrangement would comply with the Board's 40% telework limit and the three-hour daily in-person work limit identified by Ms. Harter's doctor, it would also mean Ms. Harter would work fewer hours, receive less pay, and lose her employer-sponsored health insurance. (Renner Dep., 25:5–21.) Such a pivot would not just change Ms. Harter's daily schedule; it would fundamentally change the nature of her position at DSE and create financial, logistical, and physical barriers for her. Furthermore, the Board has not explained why the percentage of work hours in the office (rather than, say, the number of hours per day, days per week, or weeks per month in-office) is the essential metric to which Ms. Harter should be held to ensure adequate performance of her essential job functions. And it has not

explained why 60% of hours in the office is the appropriate minimum, without exception.

For these reasons, the Court finds that Ms. Harter has at least raised a genuine issue of material fact as to the adequacy of the Board's alternative accommodation offer.

### D. Interactive Process

Both Parties allege the other party abandoned the interactive process of finding a mutually acceptable accommodation. Under the ADA, "both parties have a duty to participate in good faith" in the "interactive process" of "determining whether an [employee's] disability . . . disqualifies her from a particular position." *Rorrer*, 743 F.3d at 1040 (quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir.2013) and *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)). "The purpose of this process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). The interactive process "is mandatory and 'requires communication and good faith exploration of possible accommodations.'" *Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (quoting *Kleiber*, 485 F.3d at 871).

An employer's failure to engage in the interactive process in good faith independently violates the ADA only if the employee's proposed accommodation is reasonable. *See Rorrer*, 743 F.3d at 1041. Conversely, an employee's failure to accommodate claim fails if he or she acted in bad faith and caused a breakdown in the interactive process. *See Smith v. Shelby Cnty. Bd. of Educ.*, No. 23-5815, 2024 WL 3622387, at *6 (6th Cir. Aug. 1, 2024) (holding that the plaintiff "bears responsibility for the breakdown in the interactive process and has forfeited his 'otherwise qualified' status under the ADA."). Here, genuine issues of material fact remain regarding whether Ms. Harter's requested accommodation was reasonable. Accordingly, the Court considers whether Ms. Harter's claim would fail anyway because she abandoned the process and whether the Board

acted in bad faith, causing a breakdown in the process.

Genuine issues of material fact remain regarding whether either party acted in bad faith and caused a breakdown in the process. After the Board rejected Ms. Harter's 100% telework request and offered her a part-time work accommodation, Ms. Harter rejected that offer and asked DHR whether any documentation or recommendation from her doctor could result in an accommodation of greater than 40% telework. DHR responded by reiterating the 60% in-office requirement and suggesting Ms. Harter should ask her doctor for accommodation recommendations other than 100% telework. Based on that response, Ms. Harter could have reasonably concluded that the Board would not approve any level of telework above 40%, which was not acceptable to her. (*Id.*, PageID 1206.) Accordingly, she took FMLA leave and did not comply with the Board's demand that she return to in-person work.

Certainly, the interactive process resulted in a breakdown. Ms. Harter rejected the only offer proposed by the Board and refused to accept 40% telework or less. The Board rejected her 100% telework request and refused to accept anything less than 60% in-office attendance. And there was no arrangement possible where Ms. Harter could work up to three hours per day in-person (per her doctor's assessment), continue to work a full-time schedule, and comply with the Board's 60% in-person work attendance policy. But reasonable jurors could come to different conclusions about (1) whether Ms. Harter was to blame for not following up with a medical provider or refusing to propose another arrangement, and (2) whether the Board was to blame for proposing an unreasonable counterproposal and refusing to make an exception to its Telework Policy.

Ultimately, reasonable jurors may conclude that Ms. Harter or the Board acted in bad faith and abandoned the process or, alternatively, that the breakdown resulted from a genuine impasse

despite the good faith participation of both parties. Accordingly, neither party is entitled to summary judgment on Ms. Harter's failure to accommodate claim on the ground that the other side abandoned the interactive process.

Accordingly, neither side is entitled to summary judgment on the failure to accommodate claims.

## CONCLUSION

Several genuine issues of material fact remain regarding Ms. Harter's failure to accommodate claims: (1) whether in-person attendance or specific in-person tasks were essential functions of her job (and thus whether Ms. Harter's proposed 100% telework arrangement was reasonable), (2) whether the Board's proposed alternative accommodation of a part-time schedule with 40% telework was an adequate accommodation, and (3) whether either party abandoned the interactive process in bad faith and caused the process to break down.

Accordingly, the Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment filed by Defendant Franklin County Board of Commissioners (ECF No. 21), **DENIES** the Motion for Summary Judgment filed by Plaintiff Kathleen Harter (ECF No. 22), and **DENIES** Ms. Harter's Motion to Strike (ECF No. 31, PageID 1521–26). Ms. Harter's retaliation claims and general disability claims under the ADA and Ohio law are **DISMISSED**. Her failure to accommodate claims can proceed.

This case remains open.

**IT IS SO ORDERED.**

**8/19/2025**                                          **s/Edmund A. Sargus, Jr.**
**DATE**                                                   **EDMUND A. SARGUS, JR.**
                                                                **UNITED STATES DISTRICT JUDGE**